## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **PATRICIA GRIFFIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 2:22-cv-00212-JDL** |
| | ) | |
| **UNIVERSITY OF MAINE SYSTEM,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER ON PARTIAL MOTION TO DISMISS

Plaintiff Patricia Griffin's employment as a Professor of Marketing at the University of Southern Maine was terminated by the University of Maine System ("the University") in September 2021.  In her First Amended Complaint (ECF No. 15), dated October 14, 2022, against the University and Glenn Cummings, the President of the University of Southern Maine,[1] Griffin asserts that her termination was unlawful retaliation for her having spoken out against the University's facemask and vaccination policies adopted in response to the COVID-19 pandemic.  Griffin seeks relief for violations of her rights under the First Amendment's guarantee of Free Speech (Count One), and the Fourteenth Amendment's guarantees of Equal Protection and Due Process (Count Two).  She further alleges that the University violated her rights under Title VII of the Civil Rights Act for Discrimination Based on Sex, 42 U.S.C.A. § 2000e-2(a) (West 2023) (Count Three), and under the Maine

---

[1] The parties have stipulated to the dismissal of the University of Southern Maine as a Defendant (ECF No. 12).

Human Rights Act for Discrimination Based on Sex, 5 M.R.S.A. § 4572 (West 2023) (Count Four).

The Defendants have filed a Partial Motion to Dismiss (ECF No. 17) pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) seeking dismissal of Counts One and Two in their entirety and dismissal of Griffin's claims for punitive damages under Title VII of the Civil Rights Act and the Maine Human Rights Act. In response, Griffin does not object to the dismissal of Count One as to the University and does not object to the dismissal of Count Two in its entirety. Griffin also does not object to the dismissal of her claim for punitive damages in Counts Three and Four. Accordingly, this Order addresses only Griffin's claims in Count One brought against Cummings in his official and individual capacities. For the reasons that follow, I grant in part and deny in part the Defendants' Partial Motion to Dismiss.

## I. FACTUAL BACKGROUND

This factual background is drawn both from the Amended Complaint and from "documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice."[2] *Butler v. Balolia*, 736 F.3d 609, 611 (1st Cir. 2013) (quoting *Haley v. City of Bos.*, 657 F.3d 39, 46 (1st Cir. 2011)).

---

[2] The Defendants attached four Exhibits to their motion: the University's Environmental and Safety Policy, which directs the Chancellor of the University of Maine System to take all actions necessary to comply with federal and state health and safety regulations and to review and implement health and safety policies on individual campuses; an email sent by the Chancellor to University faculty, staff, and students regarding the University's mandatory masking policy, which also referenced the University's vaccination requirement; an email that Griffin sent to the Dean of the College of Management and Human Service; and a letter that Griffin sent to the Dean. Because these documents are specifically referenced in the Amended Complaint or are central to Griffin's allegations, and because Griffin has not objected to the Court's consideration of the documents or disputed their authenticity, I treat them as incorporated into the pleadings. *See Alt. Energy Inc. v. St. Paul Fire and Marine Ins., Co.*, 267 F.3d 30, 33 (1st Cir. 2001); *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)

Griffin was a Professor of Marketing at the University of Southern Maine who received "tenure status" or "just cause" status on June 25, 2021.  ECF No. 15 at 2, ¶¶ 6, 12.  On August 18, 2021, in preparation for the University's fall semester, the Chancellor of the University of Maine System announced a mandatory mask policy (the "Policy").  On August 24, Griffin participated in a luncheon meeting via Zoom at which Cummings was a speaker.  She alleges that during the event, Cummings did not wear a mask.[3]  On the same day, Griffin sent an email to the Dean of the College of Management and Human Service pertaining to the University's recently implemented mask and vaccine policies.  The email reads in pertinent part:

> I first want to say how much I love teaching at [the University of Southern Maine] as well as working with such a great faculty.  It really has been the highlight of my career and I owe a lot to you for sticking with me.  The reason for this email is because I have been following the science, data, and evidence regarding SARS-CoV-2 and searching for anything that will support wearing a mask while indoors as well as vaccinating an entire school population as the optimal method for stopping the transmission of the virus.  The reality is that my research has found no evidence to support these measures.  I wanted to share the information I gathered and relied upon when making my decision regarding these mandates before the start of classes next Monday to see that my decisions are science, evidence, and data based.  However, I do not want to cause any issues, especially for you, if I come to campus on Monday morning to teach my one face to face class so I wanted to give you enough time.

---

(recognizing that courts may consider "documents the authenticity of which are not disputed by the parties; . . . documents central to plaintiffs' claims; or . . . documents sufficiently referred to in the complaint" at the motion to dismiss stage).

[3]  Griffin does not specify whether Cummings attended the lunch in person or whether he spoke via Zoom.  Based on the nature of her allegations, I infer that he was present in person.  In any event, whether Cummings appeared in person or by Zoom is not material to the issues decided in this Order.

ECF No. 17-3 at 1.

Griffin attached a separate letter to her email, also addressed to the Dean, summarizing the results of her research on the effectiveness of mask mandates and vaccines.  She concluded the letter as follows:

> In conclusion, I have followed the science, data, and evidence and cannot find any overwhelming support for the wearing of masks nor the mandating of vaccines, especially since the overall survival rate is 99.7% if infected with Covid.  And finally, from a legal perspective, asking for my vaccination status is a violation of HIPAA.
>
> My expectation is the University of Southern Maine will appreciate a faculty member who embraces critical thinking and applies both inductive and deductive reasoning rather than emotions when making decisions.  I am teaching three courses this fall, two online and one face to face.  I welcome any evidence you can provide to the contrary of what I have found which will convince me that my conclusions about the efficacy of wearing a mask and vaccinating an entire population are wrong.

ECF No. 17-4 at 3-4.

On August 25, Griffin met with the Dean via Zoom, where she reiterated her request for data supporting the University's Policy and vaccination requirement and asserted her view that Cummings had violated the Policy at the luncheon.  Griffin alleges that she never refused to wear a mask and never stated that she would violate the Policy.

Griffin asserts that immediately following the Zoom meeting, her fall semester courses— one face-to-face class and two asynchronous online classes—were removed from the fall class list.  Two days later, University administrators convened a pre-disciplinary conference at which Griffin was present and at which she reiterated her

request for data supporting the Policy.  The administrators allegedly told her that she would not be allowed to teach courses 100% online unless she resigned and accepted a part-time position.  Griffin alleges that "other male professors were allowed to teach their classes 100% online."  ECF No. 15 at 4, ¶ 24.

On September 8, 2021, Griffin received a letter from Cummings suspending her and informing her that the University would be moving to terminate her employment.  Griffin alleges that the letter falsely asserted that her email to the Dean had indicated that she refused to comply with the Policy, and that the letter included additional false assertions about her refusal to wear a mask and her intention to violate the Policy.  She alleges that the letter caused her severe emotional distress and that it was sent in retaliation for her earlier communications with the Dean.  University administrators scheduled a Grievance Hearing, and Griffin learned that Cummings would attend the hearing.  Because she had previously filed a Human Resources complaint alleging that Cummings had created a hostile work environment, Griffin asserts that she felt intimidated by Cummings's presence and did not feel comfortable attending the hearing.  The hearing went forward in Griffin's absence, resulting in the termination of her employment effective September 22, 2021.

## II.  LEGAL ANALYSIS

### A.    Standard of Review

In reviewing a Fed. R. Civ. P. 12(b)(6) motion to dismiss for failure to state a claim, a court must "accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor."  *Rodríguez-Reyes v.*

*Molina-Rodríguez*, 711 F.3d 49, 52-53 (1st Cir. 2013) (quoting *Santiago v. Puerto Rico*, 655 F.3d 61, 72 (1st Cir. 2011)).  Similarly, "[w]hen a district court considers a Rule 12(b)(1) motion, it must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor."  *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010).  A court may also consider "implications from documents incorporated into the complaint[] and concessions in the complainant's response to the motion to dismiss."  *Arturet-Vélez v. R.J. Reynolds Tobacco Co.*, 429 F.3d 10, 13 n.2 (1st Cir. 2005).

To survive a motion to dismiss, a complaint "must contain sufficient factual matter to state a claim to relief that is plausible on its face."  *Rodríguez-Reyes*, 711 F.3d at 53 (quoting *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 44 (1st Cir. 2012)).  To assess a complaint's adequacy, courts apply a "two-pronged approach."  *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).  First, the court must "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements," and, second, the court will "take the complaint's well-pled (*i.e.*, non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief."  *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012).  "The make-or-break standard . . . is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief."  *Sepúlveda–Villarini v. Dep't of Educ. of P.R.,* 628 F.3d 25, 29 (1st Cir. 2010).  Determining the plausibility of a claim is "a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

When faced with a motion to dismiss based on multiple grounds, "the First Circuit advises lower courts to consider jurisdictional arguments first." *Justin v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 2:20-cv-00164-LEW, 2020 WL 4677294, at *1 n.1 (D. Me. Aug. 12, 2020). *See Ne. Erectors Ass'n of BTEA v. Sec'y of Labor, Occupational Safety & Health Admin.*, 62 F.3d 37, 39 (1st Cir. 1995) ("When faced with motions to dismiss under both 12(b)(1) and 12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first."). However, the Court may address the merits of a claim prior to resolving Eleventh Amendment immunity issues. *See Parella v. Ret. Bd. of R.I. Emps.' Ret. Sys.*, 173 F.3d 46, 56 (1st Cir. 1999). As to the Defendants' qualified immunity defense, the Court may also decide the merits of Griffin's constitutional claim prior to reaching the "clearly established" prong of the qualified immunity analysis. *See Pearson v. Callahan,* 555 U.S. 223, 236 (2009). Accordingly, I address the merits of Griffin's First Amendment claim before turning to the Defendants' affirmative defenses.

## B.    First Amendment Claim: Retaliation for Protected Speech

Griffin asserts that she engaged in protected speech when she made her requests to the Dean seeking data supporting the University's COVID-19 policies, and that she was speaking as a citizen on a matter of public concern. Accordingly, she contends that the Defendants violated her First Amendment rights by terminating her employment in retaliation for that speech.

To establish a prima facie case of retaliation under the First Amendment, a plaintiff must show that: "(1) she engaged in protected conduct; (2) she suffered an adverse employment action; and (3) . . . 'a causal nexus exists between the protected [conduct] and the adverse action.'" *Garayalde–Rijos v. Mun. of Carolina,* 747 F.3d 15, 24 (1st Cir. 2014) (quoting *Ponte v. Steelcase Inc.*, 741 F.3d 310, 321 (1st Cir. 2014)). The "threshold inquiry" to determine whether a public employee engaged in protected speech is "whether [the employee] spoke as a *citizen* on a matter of public concern." *O'Connell v. Marrero-Recio*, 724 F.3d 117, 123 (1st Cir. 2013). If the answer is no, the employee has no First Amendment retaliation claim. If the answer is yes, then the possibility of a First Amendment claim arises. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). "In order to survive a motion to dismiss, a plaintiff need not conclusively establish that her speech was made as a citizen; 'it is sufficient that the complaint alleges facts that plausibly set forth citizen speech.'" *Cannell v. Corizon, LLC*, No. 1:14-cv-405-NT, 2015 WL 8664209, at *8 (D. Me. Dec. 11, 2015) (quoting *Decotiis v. Whittemore*, 635 F.3d 22, 34-35 (1st Cir. 2011)).

The Defendants contend that Griffin was speaking within the scope of her employment, and not as a citizen addressing a matter of public concern, in her written communications to the Dean. It is, they contend, "axiomatic that as an employee of UMS, [Griffin's] duties and responsibilities in a practical sense included compliance with UMS policies and rules." ECF No. 17 at 8. Further, citing *Garcetti*, 547 U.S. at 422, they argue that her communications to the Dean were "those of an employee contesting her employer's rules and policies, not an activity of speaking as a citizen on a matter of public concern." ECF No. 17 at 9. Thus, the focus of the Defendants'

argument is that Griffin's speech is not protected because she was speaking in her capacity as an employee, and not as a private citizen.

Griffin responds that her email and letter are protected speech because they involved mandatory mask and vaccine policies which are "perhaps the most controversial political and social concerns in the community over the past two years." ECF No. 18 at 6. Griffin also invokes *Garcetti* for the proposition that the "controlling factor" for purposes of a public employee's protected speech is whether the statements were "made pursuant to the [employee's] duties." 547 U.S. at 421. She contends that because she was not employed by the University to "question University Policy on masks or vaccinations," and was instead employed "to teach students, and to prepare lectures and course materials," ECF No. 18 at 7, her statements fall outside the scope of what she was employed to do.

### 1. Whether Griffin's speech pertained to a matter of public concern

"Speech involves matters of public concern 'when it can "be fairly considered as relating to any matter of political, social, or other concern to the community," or when it "is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."'" *Lane v. Franks*, 573 U.S. 228, 241 (2014) (quoting *Snyder v. Phelps,* 562 U.S. 443, 453 (2011)). The Defendants argue that Griffin's speech "was not plausibly lodged on a matter of public concern . . . [but] was lodged as a complaint regarding her employer's policy." ECF No. 22 at 3. However, the Defendants do not meaningfully dispute that the underlying subject matter of Griffin's speech—the COVID-19 pandemic and the response of public institutions to it—has generated significant public debate and controversy in Maine and elsewhere

over the last three years.  Thus, the decisive question here is the other element of the threshold inquiry: whether Griffin's speech was made in her capacity as a public employee or as a private citizen.

### 2.  Whether Griffin spoke as a public employee or as a private citizen

For purposes of the First Amendment, public employees do not speak as citizens when they "make statements pursuant to their official duties." *Decotiis*, 635 F.3d at 30 (quoting *Garcetti*, 547 U.S. at 421).  This inquiry requires the Court to determine "the employee's official responsibilities" and whether "the speech at issue [was] made pursuant to those responsibilities." *Id.* at 31 (quoting *Mercado–Berrios v. Cancel–Alegría,* 611 F.3d 18, 26 (1st Cir. 2010)).  The analysis of an employee's professional responsibilities is "'practical' rather than formal, focusing on 'the duties an employee actually is expected to perform.'" *Id.* (quoting *Mercado–Berrios*, 611 F.3d at 26).  Speech that is made pursuant to an employee's official duties includes, but is not limited to, "speech that 'owes its existence to a public employee's professional responsibilities.'" *Mercado–Berrios*, 611 F.3d at 27 n.9 (quoting *Garcetti*, 547 U.S. at 421).  "[A] public employee's speech 'can be pursuant to' [her] 'official job duties even though it is not required by, or included in, [her] job description'" and "speech may be 'pursuant to' an employee's official duties when it is 'part-and-parcel of' the employee's concerns about [her] ability to properly execute [her] duties." *Shara v. Maine-Endwell Cent. Sch. Dist.*, 46 F.4th 77, 83 (2d Cir. 2022) (quoting *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203 (2d Cir. 2010)).

The Supreme Court has recognized that not all speech that "simply relates to public employment or concerns information learned in the course of public

employment" is deprived of First Amendment protections.  *Lane*, 573 U.S. at 239. This is because certain speech—for example, a public employee's sworn testimony related to misuse of public funds—has "special value precisely because [an] employee[] gains[s] knowledge of matters of public concern through their employment."  *Id.* at 240.  Speech by public employees related to their employment holds "special value" because "[g]overnment employees are often in the best position to know what ails the agencies for which they work," *id.* at 236 (alteration in original) (quoting *Waters v. Churchill,* 511 U.S. 661, 674 (1994) (plurality opinion)), and because they "'are uniquely qualified to comment' on 'matters concerning government policies that are of interest to the public at large,'" *id.* at 240 (quoting *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004) (per curiam)).

Accordingly, the fact that the speech at issue here *related* to Griffin's employment is not dispositive of whether she was speaking pursuant to her official duties as a public employee.  Instead, as set forth by the First Circuit in *Decotiis*, several non-dispositive factors must be evaluated:

> [(1)] [W]hether the employee was commissioned or paid to make the speech in question; [(2)] the subject matter of the speech; [(3)] whether the speech was made up the chain of command;  [(4)] whether the employee spoke at her place of employment; [(5)] whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it "official significance"); [(6)] whether the employee's speech derived from special knowledge obtained during the course of her employment; and [(7)] whether there is a so-called citizen analogue to the speech.

*Decotiis*, 635 F.3d at 32 (citations omitted). The factors suggest that the context in which a public employee speaks bears heavily on whether the employee was speaking pursuant to her or his official job responsibilities.

As applied to the allegations of Griffin's Amended Complaint,[4] an evaluation of the first two *Decotiis* factors—whether the employee was commissioned or paid to make the speech in question, and the subject matter of the speech—produces a mixed result. Because Griffin was employed to teach students, and not to analyze and assess the University's health and safety policies, her speech can fairly be treated as outside the ordinary scope of her duties and instead merely related to her duties. *See Lane*, 573 U.S. at 240. Viewed in this light, although Griffin's email and letter were *related* to her employment at the University, that is, without more, insufficient to deprive her speech of First Amendment protections under *Lane*. On the other hand, a practical inquiry into her employment duties, beyond her official job description, suggests otherwise. The subject matter of her email and letter concerned what she might do in the classroom and expressed concerns regarding the University's internal policies and the conditions the University had imposed on her in-person teaching responsibilities, thus bearing directly on matters within the scope of her employment.

The third and fourth *Decotiis* factors—whether the speech was made up the chain of command, and whether the employee spoke at her place of employment—support the conclusion that Griffin's speech was communicated in her capacity as an employee and not as private citizen. All of the speech at issue was communicated by

---

[4]  I do not address the fifth factor, as there were no objective observers of Griffin's speech.

Griffin directly up the chain of command to the Dean of the College of Management and Human Services.  Further, the speech was communicated exclusively within the channels of her employment via her official work email account and at face-to-face meetings with the Dean and other university administrators.  As addressed in *Gilbert v. City of Chicopee*, 915 F.3d 74, 83 (1st Cir. 2019), a complaint or concern "made up the chain of command . . . is the quintessential example of speech that owes its existence to a public employee's official responsibilities."  *See also O'Connell*, 724 F.3d at 123.

The sixth *Decotiis* factor—whether the employee's speech is derived from special knowledge that she obtained during the course of her employment—weighs against concluding that Griffin spoke as a private citizen.  Griffin does not allege that she was "uniquely qualified," *see Lane*, 573 U.S. at 240, to share information about the effectiveness of mask mandates and vaccine requirements as a result of her employment, nor did she obtain special information regarding the Policy through her position.  Accordingly, Griffin's speech does not hold that "special value" of protected speech that pertains to an employee's official responsibilities as was contemplated by the Supreme Court in *Lane*.

The seventh *Decotiis* factor—whether there is a so-called citizen analogue to the speech—ultimately weighs in favor of a finding that Griffin's speech was made outside the scope of her employment.   On one hand, unlike a letter to a newspaper or other "kind[s] of activit[ies] engaged in by citizens who do not work for the government," *Garcetti*, 547 U.S. at 423-24, Griffin's email and letter were sent directly to her superior through her University email account and pertained to her

13

disagreement with the Policy and its impact on her face-to-face teaching conditions. *See Weintraub*, 593 F.3d at 204 (discussing citizen analogues in the context of union grievances and noting that "[t]he lodging of a union grievance is not a form or channel of discourse available to non-employee citizens, as would be a letter to the editor or a complaint to an elected representative or inspector general"). Similarly, the communication that occurred during Griffin's meeting with the Dean was plainly a private, employment-related encounter. Moreover, Griffin states in her email that she had made a "decision regarding these mandates," ECF No. 17-3 at 1, from which one could fairly infer that she was informing her employer that she might not comply with the Policy based on her research.

However, at the motion to dismiss stage I must draw all reasonable inferences in Griffin's favor. In that light, it is also possible to infer that Griffin's "decision" represented the conclusion or conclusions she had drawn regarding the Policy and its efficacy, and not a final decision not to comply with it. The substance of Griffin's email and letter also communicated her concerns about the University's response to the pandemic and the efficacy of mask mandates on college campuses. Viewed in this manner, Griffin's speech could be considered "sufficiently analogous to the speech of other citizens in the community troubled," *Decotiis*, 635 F.3d at 34, by facemask and vaccine policies implemented by public institutions during the COVID-19 pandemic, thus warranting a conclusion that there is a plausible citizen analogue to Griffin's speech.

Assessing the allegations of Griffin's Amended Complaint in relation to the *Decotiis* factors produces an uncertain result. However, accepting all of Griffin's

factual allegations as true, the question that I must ultimately decide at this preliminary juncture is whether the Complaint has provided "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A "well-pleaded complaint may proceed even if it appears 'that a recovery is very remote and unlikely.'" *Id.* at 556 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).  Plausible "means something more than merely possible," *Schatz*, 669 F.3d at 55, and "[a] plausible but inconclusive inference from pleaded facts will survive a motion to dismiss . . . ." *Sepúlveda–Villarini,* 628 F.3d at 30.

Here, Griffin has pleaded sufficient facts to make it more than merely possible that once fully developed, the facts will support the conclusion that although Griffin's speech related to her official duties as a public employee, the subject matter of her speech pertained to a matter of great public concern and was outside the scope of her duties as a professor of marketing.  Whether the same conclusion may be true after the parties have completed discovery is another matter for another day.  "[I]t is entirely possible that additional facts might show" that Griffin is not entitled to the relief that she seeks, but "absent factual development, dismissal is unwarranted" at this stage.  *Lowe v. Mills*, 68 F.4th 706, 715-16 (1st Cir. 2023).  Accordingly, Griffin has stated a plausible First Amendment claim upon which relief could be granted.  Thus, I turn to the Defendants' affirmative defenses.

## C.   Eleventh Amendment Immunity

The Defendants argue that Cummings cannot be held liable for damages in his official capacity because he is not a "person" for the purposes of a section 1983 action.  Although they concede that there are limited circumstances under which state

officials may be sued for prospective injunctive relief, they contend that the relief that Griffin seeks is not prospective in nature and that she has not alleged an *ongoing* violation of federal law.  Griffin counters that "because President Cummings was an authorized decisionmaker for UMS, his actions are fairly said to be that of UMS and accordingly, Plaintiff's official capacity claims against Cummings are valid."[5]  ECF No. 18 at 10.

States and their agents, including a state university, *Wang v. N. H. Bd. Of Registration in Med.*, 55 F.3d 698, 700 (1st Cir. 1995), are not "persons" subject to suits for monetary damages under section 1983.  *Brown v. Newberger*, 291 F.3d 89, 92 (1st Cir. 2002) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)). This is because the Eleventh Amendment generally bars suits against the state, arms of the state, or a state's agent absent "consent, waiver, or abrogation" of immunity. *Irizarry–Mora v. Univ. of P. R.,* 647 F.3d 9, 11 n.1 (1st Cir. 2011).

Notwithstanding Eleventh Amendment immunity, the *Ex parte Young* doctrine allows "suit[s] challenging the constitutionality of a state official's action" and permits federal courts to grant prospective injunctive relief against a state official "to prevent a continuing violation of federal law."  *Green v. Mansour*, 474 U.S. 64, 68 (1985) (citing *Ex parte Young*, 209 U.S. 123, 155-56, 159 (1908)).  Accordingly, in "a [section] 1983 action . . . a federal court's remedial power, consistent with the

---

[5] This appears to be an argument based on municipal liability standards from *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  Griffin also cites multiple cases that address municipal liability standards, *see e.g.*, *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403-04 (1997).  *Monell* is intended to "directly address[] 'monetary, declaratory, or injunctive relief'" in the context of municipal liability. *Dirrane v. Brookline Police Dep't*, 315 F.3d 65, 71 (1st Cir. 2002) (quoting *Monell*, 436 U.S. at 690). Because Cummings is a state official, the appropriate inquiry as to whether he may be held liable in his official capacity is whether the Eleventh Amendment bars the particular relief sought by Griffin.

Eleventh Amendment, is necessarily limited to prospective injunctive relief, and may not include a retroactive award which requires the payment of funds from the state treasury." *Quern v. Jordan*, 440 U.S. 332, 338 (1979) (second alteration in original) (quoting *Edelman v. Jordan*, 415 U.S. 651, 677 (1974)). The *Ex parte Young* exception may apply if a "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 296 (1997)).

Griffin has not asserted arguments pertaining to the Eleventh Amendment, stating only that her official capacity claim against Cummings and her request for reinstatement are proper. Accordingly, she has waived any argument that the relief she requested—with the exception of reinstatement—is not barred by the Eleventh Amendment. *See, e.g.*, *Olympic Mills Corp. V. Rivera Siaca (In re Olympic Mills Corp.)*, 477 F.3d 1, 17 (1st Cir. 2007) (concluding that plaintiff's damages claim was waived because "the argument was fatally undeveloped . . . [with] no analysis whatsoever"); *Collins v. Marina-Martinez*, 894 F.2d 474, 481 n.9 (1st Cir. 1990) ("It is settled beyond peradventure that issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Despite the absence of any argument on this issue, I nonetheless address whether Griffin's claims for relief, brought against Cummings in his official capacity, are barred by the Eleventh Amendment.

First, Griffin's requests for retroactive benefits and salary, and compensatory damages for, among other things, lost wages, benefits, and pension monies, are

clearly foreclosed by the Eleventh Amendment bar on retrospective relief and prospective relief that would have more than an ancillary impact on the state treasury. *See Camacho-Morales v. Caldero*, 68 F. Supp. 3d 261, 274 (D.P.R. 2014) ("An award of damages . . . would obviously require the Commonwealth to open its coffers. Back pay, which 'compensates plaintiffs for lost wages and benefits between the time of the discharge and the trial court judgment,' would have the same effect." (quoting *Johnson v. Spencer Press of Me., Inc.,* 364 F.3d 368, 379 (1st Cir. 2004))).

Second, Griffin's requests for (1) a declaratory judgment that the "Defendants' acts . . . have violated" her constitutional rights, and (2) a declaratory judgment "that the disciplinary action taken against [her], including termination, shall be null and void," ECF No. 15 at 6-7, are foreclosed to the extent that they constitute "judgments against state officers declaring that they violated federal law in the past." *P. R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 146 (1993).

Third, Griffin's request for reinstatement, which is fairly treated as a request for prospective injunctive relief, is generally considered an appropriate form of prospective injunctive relief under *Ex parte Young*. *See Doe v. Lawrence Livermore Nat'l Lab'y*, 131 F.3d 836, 841 (9th Cir. 1997) (collecting cases); *Lane v. Cent. Ala. Cmty. Coll.*, 772 F.3d 1349, 1351 (11th Cir. 2014); *Jones v. Tex. Juv. Just. Dep't*, 646 F. App'x 374, 376 (5th Cir. 2016). The Defendants do not argue otherwise, instead acknowledging that "seeking reinstatement may fit within the *Ex [p]arte Young* paradigm in certain circumstances," but that Griffin's accompanying requests for monetary relief are barred by the Eleventh Amendment. ECF No. 22 at 5.

Accordingly, Griffin's requests for retrospective and prospective monetary damages, as well as retrospective declaratory relief, brought against Cummings in his official capacity, are barred by the Eleventh Amendment. However, because Griffin's request for reinstatement is not barred, the Defendants' motion as to Griffin's official capacity claim is denied.

## D.    Qualified Immunity

As to the claim brought against Cummings in his individual capacity, the Defendants argue that Cummings is entitled to qualified immunity because Griffin has not alleged a plausible constitutional violation. They also contend that it would not have been clear to Cummings that terminating Griffin's employment would violate a clearly established right: "the relevant question for qualified immunity purposes is whether . . . [Griffin] had a clearly established right to advocate against and seek the justifications for a university's indoor masking policy in the midst of a global pandemic such that it would have been clear to Cummings that he could not take adverse employment actions for such conduct by an employee." ECF No. 17 at 13. "Given the circumstances of the alleged violation and the state of the law during the pandemic, it is not at all clear that Cummings should have known, let alone *obviously understood*, that taking such actions would be a violation of the law." ECF No. 17 at 13.

Griffin counters that the Defendants mischaracterize the constitutional right at issue, arguing that "in a nearly identical circumstance in *Givhan*, [the Supreme Court] held that a teacher has a First Amendment right to raise concerns and questions to her employer regarding school policies she disagreed with." ECF No. 18

at 11.  She asserts that "President Cummings should have obviously understood that terminating [her] for simply requesting data and raising concerns with the Policy was a violation of her First Amendment rights."  ECF No. 18 at 11-12.

"Government officials sued in their individual capacities are immune from damages claims unless '(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time.""  *Irish v. Fowler*, 979 F.3d 65, 76 (1st Cir. 2020) (quoting *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018)).  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.  When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In determining whether a government official is entitled to qualified immunity, the Court may exercise its discretion in determining which prong of the qualified immunity test to address first.  *Pearson,* 555 U.S. at 236.  Assuming that Griffin has plausibly stated a First Amendment violation, I proceed to the clearly established prong of the analysis.

The clearly established prong of the analysis is comprised of two parts.  First, the Court must inquire "whether the precedent is 'clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'"  *Irish II*, 979 F.3d at 76 (quoting *Wesby*, 583 U.S. at 63).  The precedent must be "dictated by 'controlling authority' or 'a robust "consensus of cases of persuasive authority."'"  *Wesby*, 583 U.S. at 63 (quoting *al-Kidd*, 563 U.S. at 741-42).  *See*

*Decotiis*, 635 F.3d at 37 ("[F]or the right to be clearly established, the plaintiff must point to controlling authority or a body of persuasive authority, existing at the time of the incident, that can be said to have provided the defendant with 'fair warning.'" (quoting *Hope v. Pelzer*, 356 U.S. 730, 741 (2002))).  Although a general statement of law or broad constitutional rule may be sufficient to give "fair and clear warning" to a public official, the state of pre-existing law must make "the unlawfulness [of their conduct . . .] apparent."  *French v. Merrill*, 15 F.4th 116, 126-27 (1st Cir. 2021) (first quoting *United States v. Lanier*, 520 U.S. 259, 271 (1987), then quoting *White v. Pauly*, 580 U.S. 73, 79-80 (2017) (per curiam)).  "A rule is too general, however, 'if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established."'"  *Id.* at 127 (quoting *Wesby*, 583 U.S. at 64).

Second, the Court must ask "whether '[t]he rule's contours [were] so well defined that it [would be] clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.'"  *Irish II*, 979 F.3d at 76 (first and second alterations in original) (quoting *Wesby*, 583 U.S. at 63-64).  "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014).  "[I]t is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'"  *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

Accordingly, under this inquiry, Griffin is not required to point to a case that is "directly on point," but she must at least point to a body of authority that places

"the . . . constitutional question beyond debate" under the particularized facts of the case. *French*, 15 F.4th at 126 (quoting *White*, 580 U.S. at 79). A plaintiff bears the "heavy burden" of demonstrating that the law was clearly established at the time of the official's allegedly unconstitutional actions. *Lachance v. Town of Charlton*, 990 F.3d 14, 20 (1st Cir. 2021) (quoting *Mitchell v. Miller*, 790 F.3d 73, 77 (1st Cir. 2015)). For reasons I will explain, Griffin has not carried that burden here.

### 1. Whether controlling authority or persuasive precedent placed Griffin's constitutional right "beyond debate"

Relying solely on *Givhan*, Griffin asserts that "President Cummings should have obviously understood that terminating [her] for simply requesting data and raising concerns with the Policy was a violation of her First Amendment rights." ECF No. 18 at 11-12. Griffin's reliance on *Givhan* is unpersuasive for three reasons, and thus Griffin has not met her burden of showing that her right was clearly established at the time that her employment was terminated.

First, contrary to Griffin's argument that her case is "identical" to *Givhan,* ECF No. 18 at 8, the speech at issue in *Givhan* related to a teacher's opposition to what she believed were racially discriminatory hiring policies which did not directly impact her position. *See Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 412-13 (1979). It is exceedingly unlikely that a 1979 Supreme Court decision, with facts bearing little relation to those presented here, would have given fair warning to a public official that terminating Griffin in response to her privately communicated emails would violate her constitutional rights.

Second, even if the factual circumstances were similar, *Givhan* stands for the specific proposition that freedom of speech under the First Amendment is not "lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public." *Givhan*, 439 U.S. at 415-16. *See also King v. Maine Dep't of Corr.*, No. 1:13-cv-00163-JDL, 2015 WL 2092526, at *5 n.6 (D. Me. May 5, 2015) ("[*Givhan*] supports the proposition that statements made only inside the workplace may support a claim even though they are not shared with the general public."). The fact that the private nature of a public employee's speech does not foreclose First Amendment protections is insufficient to give fair warning to a reasonable official that terminating an employee for privately speaking about their employer's health and safety policies would violate a clearly established right.

And third, *Givhan* did not analyze the considerations subsequently articulated by the Supreme Court in *Garcetti* and *Lane* as to when a public employee's speech is made pursuant to their official responsibilities. *See Lyons v. Vaught*, 875 F.3d 1168, 1176 (8th Cir. 2017) (holding that pre-*Garcetti* cases were not instructive to the qualified immunity analysis because those decisions "did not address whether the speech at issue was made pursuant to the [professor]'s job duties, an issue that would have changed the analysis and perhaps the result in each case"). These more recent decisions require the Court to inquire into "the duties an employee actually is expected to perform" and not just the employee's title or job description, *Garcetti*, 547 U.S. at 424-25, and "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties," *Lane*, 573 U.S. at 240. Thus, it would not have been clear to every reasonable official in Cummings's

position—based solely on *Givhan*—that Griffin spoke outside the scope of her employment, let alone that she had a clearly established right to privately email the Dean her concerns about the University's mask and vaccine policies.

Turning to other controlling authority on this issue, First Amendment decisions like *Givhan*, *Lane*, and *Garcetti* set forth "broad constitutional rule[s]" that are clearly established. *Decotiis*, 635 F.3d at 37. More specifically, *Lane* sets forth the general rule that speech merely *relating* to a public employee's duties is not deprived of First Amendment protections. *Lane*, 573 U.S. at 239. However, these broad rules do not, without more, clearly establish that Griffin had a constitutionally protected right to privately communicate her concerns about the University's COVID-19 policies to her superiors. This is particularly true in light of the fact-intensive inquiry required to determine whether a public employee's speech was made within the scope of their employment, or whether they spoke as a private citizen. Accordingly, I do not conclude—nor does Griffin point to any precedent that suggests otherwise—that her right to speak privately to her superior regarding her concerns about the University's internal health and safety policies was clearly established at the time that Cummings terminated her employment.

### 2. Whether Cummings had fair warning that his conduct would violate a clearly established right under the particular factual circumstances

Even if I were to conclude that, as posited in her opposition to the Motion to Dismiss, Griffin's right was clearly established, a reasonable official would not have had fair warning that terminating Griffin's employment under these particular factual circumstances would violate her constitutional rights. The context and

content of Griffin's speech, as analyzed under the *Decotiis* factors, produce a mixed result as to whether Griffin was speaking within the scope of her employment and hence entitled to constitutional protection. Although I have concluded, at this preliminary stage, that Griffin has stated a plausible claim for relief, the contours of Griffin's right to privately communicate her concerns about the University's COVID-19 policies and request additional data was not sufficiently clear such that Cummings would have had fair warning that his conduct would violate that right.

The private nature of Griffin's speech—communicated through her employer-provided email account directly to a superior—could have led a reasonable official to believe that terminating Griffin's employment would not violate a clearly established right. Notably, in *Roy v. Correct Care Solutions, LLC*, the First Circuit explained that "[s]ignificantly, [the plaintiff] only complained internally. And, although the Supreme Court has established that form is never 'dispositive' of the public concern question, it has sometimes seen a plaintiff's failure 'to inform the public' about her concerns as cutting against First Amendment protection." 914 F.3d 52, 73 (1st Cir. 2019) (citations omitted) (first quoting *Garcetti*, 547 U.S. at 420, then quoting *Connick v. Myers*, 461 U.S. 138, 148 (1983)). The First Circuit concluded that "[r]easonable officials in [the defendants'] positions, then, could have deemed Roy's complaints unprotected" and thus, were entitled to qualified immunity. *Id.* Here, similarly, it would have been objectively reasonable for Cummings to believe, due to the private nature of Griffin's speech, that his conduct would not violate her First Amendment rights.

Furthermore, in light of the content of Griffin's speech, it would not have been plainly obvious to every reasonable official in Cummings's position whether Griffin's speech was constitutionally protected, or whether her speech merely amounted to a privately communicated employee grievance. The state of the law when Cummings terminated Griffin's employment would have suggested that Griffin did not have a constitutionally protected right to raise private employee grievances to her superiors. *See, e.g.*, *Connick*, 461 U.S. at 147 ("[W]hen a public employee speaks . . . as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."); *Weinstein v. Univ. of Conn.*, 753 F. App'x 66, 68 (2d Cir. 2018) (concluding that a university dean was entitled to qualified immunity because "given the context of [the former professor]'s comments, at a minimum, officials 'of "reasonable competence could disagree" on' whether" the professor's privately filed complaint about nepotistic behavior and a labor grievance were private, employee grievances related to his employment or "protected by the First Amendment" (quoting *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007))). And as this Court has previously emphasized, although a public employee's personal interest in speaking out on an issue of public concern does not foreclose First Amendment protections, public employees may not constitutionalize their personal grievances. *See, e.g.*, *King*, 2015 WL 2092526, at *5 ; *Gardner v. Thomas*, No. 1:13-cv-331-GZS, 2014 WL 916397, at *8-9 (D. Me. Mar. 10, 2014) ("Speech 'calculated to redress personal grievances' will not support a [F]irst [A]mendment retaliation claim." (quoting *Ruotolo v. City of New*

*York*, 514 F.3d 184, 189 (2d Cir. 2008))).  Griffin's email and attached letter—which were comprised of complaints about Cummings's comments at the Zoom luncheon regarding COVID-19 vaccines, the new conditions that were being imposed on her in-person teaching routine, and whether she could be persuaded to comply with the University's Policy—could have led a reasonable official to believe that she was communicating personal grievances about her work environment to her superiors.

It also would not have been clear to a reasonable official whether Griffin's speech was made within the scope of her employment as a public employee and thus not entitled to constitutional protection.  Controlling precedent at the time could have led a reasonable official in Cummings's position to believe that Griffin did not have a constitutionally protected right to the speech at issue, which was communicated privately to her superior and pertained to various employment-related concerns about the conditions imposed on her teaching responsibilities.  *See, e.g., O'Connell*, 724 F.3d at 123 (concluding that an employee's speech was "the quintessential example of speech that owes its existence to a public employee's professional responsibilities" and was thus unprotected because it "consisted exclusively of several instances in which [the plaintiff] communicated to [her superiors] her reluctance to undertake personnel-related actions that she deemed either illegal or unethical . . . [and thus] solely focused on events at her workplace and was made exclusively to fulfill her responsibilities as [the agency]'s Human Resources Director"); *Charette v. St. John Valley Soil & Water Conservation Dist.*, 332 F. Supp. 3d 316, 364 (D. Me. 2018) ("This context [of complaints made to her supervisors] demonstrates that in voicing her concerns about [her employer's misuse of funds], Plaintiff was speaking

pursuant to her official duties.  Indeed, Plaintiff herself explicitly stated that in refusing to do anything illegal she was saying how she was going to 'do [her] job.'" (third alteration in original)).

Accordingly, regardless of whether Cummings did in fact violate Griffin's First Amendment rights—which is yet to be determined—a reasonable University official in Cummings's position could have reasonably believed that he was not violating Griffin's constitutional rights by terminating her employment.  Thus, because controlling authority or a consensus of persuasive authority would not have placed the constitutional question beyond debate under the particular factual circumstances of this case, and because Cummings would not have had fair warning that his conduct would violate a clearly established right, Cummings is entitled to qualified immunity.

## III.  CONCLUSION

For the reasons stated above, the Defendants' Partial Motion to Dismiss (ECF No. 17) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. Granted as to Count One brought against Cummings in his individual capacity, and denied as to Count One brought against Cummings in his official capacity;

2. Granted as to Count One against the University in its entirety;

3. Granted as to Count Two in its entirety; and

4. Granted as to the punitive damages claims arising under Counts III and IV.

It is further **ORDERED** that the Amended Complaint (ECF No. 15) is **DISMISSED IN PART** as to Count One against the University, Count One against

Cummings in his individual capacity, Count Two in its entirety, and the claims for punitive damages arising under Counts III and IV.

**SO ORDERED.**

**Dated:  August 23, 2023**

_____
**/s/ Jon D. Levy**
**CHIEF U.S. DISTRICT JUDGE**