UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| PATRICIA GRIFFIN )<br>)<br>     Plaintiff, )<br>)<br>   v.  )<br>)<br>UNIVERSITY OF MAINE SYSTEM, )<br>et al., )<br>)<br>     Defendants. )<br>) | No. 2:22-cv-00212-SDN |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Patricia Griffin ("Professor Griffin") brings this suit against the University of Maine System and its president, Jacqueline Edmonson (collectively "Defendants"), alleging Defendants wrongfully terminated Professor Griffin for her protected speech, in violation of the First Amendment. Defendants now mov for summary judgment. For the reasons that follow, I grant Defendants' motion.

**I. PROCEDURAL HISTORY**

Professor Griffin filed her initial Complaint against Defendants on July 14, 2022 (ECF No. 1). The parties stipulated to dismissal of Defendant University of Southern Maine from the Complaint, which occurred on September 13, 2022 (ECF No. 12). Defendants filed their first Partial Motion to Dismiss on September 27, 2022 (ECF No. 13). The Court denied Defendants' first Partial Motion to Dismiss as moot (ECF No. 16) in light of Professor Griffin filing an Amended Complaint (ECF No. 15). Defendants filed a subsequent Partial Motion to Dismiss on October 28, 2022 (ECF No. 17), and Professor Griffin responded to Defendants' motion on November 18, 2022 (ECF No. 18). This Court

1

granted in part and denied in part this second Partial Motion to Dismiss, leaving in place Plaintiff's First Amendment claims against President Edmondson[1] in her official capacity only (Count I), and Plaintiff's claims under Title VII of the Civil Rights Act and the Maine Human Rights Act (Counts III & IV) (ECF No. 27). Defendants filed their Answer to the Amended Complaint on September 11, 2023 (ECF No. 33). Defendants now move for summary judgment against Professor Griffin (ECF No. 43). Professor Griffin responded in opposition to Defendants' motion (ECF No. 52).

## II. FACTUAL BACKGROUND

### A. Institutional Information

The University of Southern Maine ("USM") is an undergraduate institution and part of the University of Maine System ("UMS"). Defendants' Reply to Pl.'s Stmt. of Mat. Facts ("DRSMF"), (ECF. No. 57, ¶ 1).[2] Professor Griffin served as a lecturer at USM in the College of Management and Human Services in USM's School of Business. Joint Factual Stipulation ("JFS"), (ECF No. 42, ¶ 1). Glen Cummings served as president of USM in the fall of 2021. *Id.* at ¶ 4. During the relevant time period, Joanne Williams served as Dean of the College of Management and Human Service and directly supervised Professor Griffin. *Id.* at ¶ 2. Prior to August 2021, Professor Griffin had no personal workplace issues with Dean Williams or President Cummings. DRSMF, ¶¶ 2-3.

---

[1] On August 31, 2023, the Court granted Plaintiff's Motion to Substitute Party from Glen Cummings to Jacqueline Edmonson since Edmonson is the current president of the University of Southern Maine. *See* ECF Nos. 31, 32.

[2] Defendants' Reply to Plaintiff's Statement of Material Facts contains both parties' substantive factual statements and their responses to one another. In her Opposing Statement of Material Facts and Statement of Additional Facts, Plaintiff failed to number her proposed additional material facts consecutively, allowing for two proposed material facts with the same number (e.g. Defendant's proposed material fact #1 and Plaintiff's proposed material fact #1). As a result, Defendants followed this numbering system in their Reply to Plaintiff's Statement of Material Facts. To simplify the record, in this order, "DRSMF" refers to Defendants' factual statements and "DRSMF (II)" refers to Plaintiff's factual statements, which are both contained in ECF No. 57.

### B. Curriculum Scheduling at USM

From 2020 until the fall of 2021, Professor Griffin taught all her classes online in light of the COVID-19 lockdown. JFS, ¶ 6. USM schedules courses during the immediately preceding academic semester. DRSMF, ¶ 24. In the spring of 2021, USM administration finalized Professor Griffin's fall 2021 schedule to include both one in-person and one online section of Marketing Strategy (Business 360), one online section of Professional Selling (Business 364), and one in-person section of Consumer Behavior (Business 365). JFS, ¶¶ 7-8. Prior to the start of classes, USM canceled Professor Griffin's Consumer Behavior course due to a lack of student enrollment. *Id.* at ¶ 9. As a result of the cancelation, Professor Griffin's schedule included only one in-person class for the fall 2021 semester.

On July 26, 2021, in response to questions from faculty members, USM Provost and Executive Vice President for Academic and Student Affairs Jeannine Uzzi explained via email that USM would not switch in-person courses to online administration at that time, because "students made enrollment and housing decisions based on the teaching modalities [USM] announced last spring." DRSMF, ¶ 25. On August 6, 2021, Associate Dean of the School of Business Jane Kuenz sent notice to faculty via email that USM would not switch in-person courses to online administration without the faculty member obtaining a verified ADA accommodation approval from Human Resources. *Id.* at ¶ 26.

### C. UMS Masking

In light of the Delta variant COVID-19 surge, sometime between late July and early August, UMS began to worry about whether it would be safe to follow through with its earlier decision to return to in-person learning. DRSMF, ¶ 5. To mitigate these concerns,

on August 18, 2021, UMS Chancellor Dannel Malloy initiated a face covering mandate (the "Masking Policy" or the "Policy") that required all persons to wear face coverings "when indoors at any UMS facility." *Id.* at ¶ 6-7. UMS also disseminated a website link for individuals to view the Masking Policy and sources related to the Policy. *Id.* at ¶ 9. Later, at her deposition, Professor Griffin testified that she was aware Chancellor Malloy based this Masking Policy on the Centers for Disease Control and Prevention ("CDC") guidelines, and Professor Griffin also testified she was aware of her obligation as a USM employee to comply with the Masking Policy. *Id.* at ¶¶ 13-14.

### D. Professor Griffin's Statements on Masking and USM's Response

On August 24, 2021, six days before the fall semester began, Professor Griffin sent an email from her USM account to Dean Williams with the subject line "addressing the current USM mandates," which reads in pertinent part:

> I first want to say how much I love teaching at [USM] as well as working with such a great faculty. It really has been the highlight of my career and I owe a lot to you for sticking with me.
>
> The reason for this email is because I have been following the science, data, and evidence regarding SARS-CoV-2 and searching for anything that will support wearing a mask while indoors as well as vaccinating an entire school population as the optimal method for stopping the transmission of the virus.
>
> The reality is that my research has found no evidence to support these measures. I wanted to share the information I gathered and relied upon when making my decision regarding these mandates before the start of classes next Monday to see that my decisions are science, evidence, and data based.
>
> However, I do not want to cause any issues, especially for you, if I come to campus on Monday morning to teach my one face to face class so I wanted to give you enough time.

DRSMF, ¶ 31; Ex. 11, (ECF No. 44-11). Professor Griffin attached to this email the data she had collected on the efficacy of COVID-19 masking protocols. *See* Ex. 11, (ECF No. 44-11).

At Professor Griffin's deposition, Defendants' attorney questioned Professor Griffin about her intent behind the August 24 email, and specifically what she meant about her "decision regarding these mandates." *See* Pl.'s Dep. Tr., (ECF No. 44-2). Professor Griffin testified that she did not know the meaning behind her reference to a "decision" in the email, and that she was seeking only USM's data in support of the Masking Policy when she sent the email. DRSMF, ¶ 32. When asked if she intended to comply with the Masking Policy at the time she sent the email, Professor Griffin stated she could not answer the question and that she did not know. *Id.* at ¶ 34. Professor Griffin did testify, however, that she understood how Dean Williams could view the email as an indication of Professor Griffin's unwillingness to comply with the Masking Policy. *Id.* at ¶ 35.

Shortly after Professor Griffin sent the August 24 email, Dean Williams forwarded the email to Dean Kuenz, Provost Uzzi, and Vice President of Human Resources Natalie Jones. DRSMF (II), ¶ 6. In addition to forwarding the email, Dean Williams stated in pertinent part:

> Please see the attached email from Pat Griffin who it seems plans to come to campus on Monday to teach without wearing a mask. It also sounds like she may not be vaccinated. Is there a way to verify if she uploaded her vaccination status? I am assuming this is not the first person to do this so I thought I would check in with you before responding. She is teaching 2 f2f and 2 online classes. Please let me know your thoughts on managing this. Jane and I will look at other ways to cover her f2f classes.[3]

*Id.*; ECF No. 53-2. At that time (August 24, 2021), UMS did not mandate vaccinations for its employees. DRSMF (II), ¶ 7.

---

[3] "f2f" is an abbreviation for "face to face," meaning in-person administration.

Vice President Jones responded to Dean Williams's forwarded email explaining that the Masking Policy applied universally to vaccinated and non-vaccinated employees, employees who chose not to vaccinate would be required to test weekly, and Professor Griffin's refusal to comply with the mask mandate would result in disciplinary action, including termination. Ex. 4, (ECF No. 53-4). Dean Williams responded to Vice President Jones as follows:

> Thanks for your response. I am pretty sure she is not going to change her position which means we need to cover a class immediately. In that case, she will not be fulfilling the duties of her contract this Fall. Is the correct next step a pre-disciplinary meeting?

DRSMF (II), ¶ 9; Ex. 4, (ECF No. 53-4). Vice President Jones replied to Dean Williams as follows:

> I think the next step is a meeting with her - and if she would like the union to join her, they can be invited. If you want to write it up as pre-disciplinary - it would be ahead of action (she hasn't actually done anything yet). I appreciate her professionalism in reaching out to you ahead of time to discuss. So I would say - set up a zoom and walk through what she would like to do.

DRSMF (II), ¶ 10; Ex. 4, (ECF No. 53-4). Thereafter, Dean Williams responded to Professor Griffin's August 24 email to convey Vice President Jones's instructions that the masking requirement applied universally to all employees and that non-vaccinated employees would be required to test weekly, as well as to propose a meeting between herself and Professor Griffin. DRSMF (II), ¶ 11; Ex. 5, (ECF No. 53-5). At 6:24am on the following day—August 25, 2021—Dean Williams sent a subsequent email to Professor Griffin reiterating her desire to meet "sometime [that day] if possible" and informing Professor Griffin that an Associated Faculties of the Universities of Maine ("AFUM" or "Union") representative could be present at the meeting. DRSMF (II), ¶ 12; Ex. 6, (ECF No. 53-6). At 6:49am, Professor Griffin confirmed that she was available to meet with Dean Williams that afternoon. DRSMF (II), ¶ 13.

At 1:08pm, Vice President Jones responded to a question from Human Resources Partner Meghan Schratz about the next steps if Professor Griffin refused to comply with the Masking Policy:

> I just clarified with Labor [Relations]. If after the 2:00 [Professor Griffin] continues to refuse - we will need to set up an immediate PDC- so I would get a standard PDC letter/memo ready that you can have in your back pocket for these situations - and then if it needs to be scheduled - let me know - I'll give Paul a heads up.[4]

*Id.* at ¶ 14; Ex. 7, (ECF No. 53-7). Professor Griffin met with Dean Williams sometime between 2:00pm and 3:30pm. DRSMF, ¶ 36. At 2:48pm, Ms. Schratz wrote an email to a USM Labor Relations employee stating in pertinent part:

> We had an AFUM faculty member, Patricia Griffin, Lecturer in Marketing, who communicated to [Dean] Williams via email yesterday that she would refuse to wear a mask to teach her face to face course due to the lack of science and data supporting mask use. [Professor Griffin] was assigned to teach two online and one face to face course this fall semester.
>
> [Dean Williams] met with [Professor Griffin] today to discuss the email, and [Professor Griffin] has confirmed that she will not wear a mask, nor will she be interested in teaching her two online courses (even as part time faculty). [Dean Williams] asked if that meant [Professor Griffin] was resigning. [Professor Griffin] said that she refused to resign and told [Dean Williams] that the university will need to terminate her. [Dean Williams] offered to have her meet with HR and AFUM another time, and [Professor Griffin] also refused that meeting offer.

DRSMF, ¶ 17; Ex. 8, (ECF No. 53-8).[5]

The next day—August 26, 2021—at 6:45am, Professor Griffin sent an email to students in her Business 364 course stating that "she will not be teaching the course this fall." DRSMF, ¶ 38. In response to one Business 364 student's inquiry on whether Professor Griffin would be teaching any other courses, Professor Griffin stated: "No, I

---

[4] "PDC" is an abbreviation for pre-disciplinary conference. DRSMF (II), ¶ 14.
[5] Plaintiff claims Ms. Schratz sent the email to Labor Relations at or around the time of the meeting between Dean Williams and Professor Griffin. DRSMF (II), ¶ 17. Defendants qualify Plaintiff's factual assertion on this point to highlight that Ms. Schratz's language in the email indicates that the email had to occur after the meeting ended. *Id.* The exact timing of Ms. Schratz's email does not change the outcome of this matter.

7

don't think so (I won't wear a mask)." *Id.* at ¶ 39; Ex. 15, (ECF No. 44-15). Dean Kuenz declared that she found Professor Griffin's email to her students to be "highly unprofessional because it informed students that their course was being canceled." DRSMF (II), ¶ 24. In response to Professor Griffin's emails to her students, Dean Kuenz emailed an administrative assistant with directions to "cancel BUS 364 and both sections of [BUS] 360 and notify students that they will need to work with advisors or the Department Chair to find alternate courses for the Fall." DRSMF (II), ¶¶ 23-24.

Professor Griffin emailed another student at 10:39am, stating: "Just wanted to give you a heads up, the school has mandated the wearing of masks and I will not comply so was fired." DRSMF, ¶ 42; Ex. 14, (ECF No. 44-14). At 11:16pm, Professor Griffin sent an email to a USM professor, which stated: "I refused to wear a mask, and unfortunately, the school has their mandates and feel because I will not follow that specific one, they must terminate me." DRSMF, ¶ 46; Ex. 16, (ECF No. 44-16). At her deposition, Professor Griffin testified that when she used the words "refused to wear a mask" she was referring to the past, and when she used the words "I will not follow that specific [mandate]," she was referring to the future. DRSMF, ¶¶ 47-48; Pl. Dep. Tr. at 89:3-6.

### E. Grievance Process

On August 27, 2021, Professor Griffin, accompanied by AFUM representative Paul Johnson, met with Dean Williams and Ms. Schratz as a follow up to Professor Griffin's August 24 email to Dean Williams. JFS, ¶ 10. During his deposition, Mr. Johnson testified that during this meeting, Ms. Griffin was "emphatic" that she would not wear a mask in any of the buildings on the campus at USM. DRSMF, ¶ 55. When asked to describe how Professor Griffin was "adamant that she would not wear a mask," Mr. Johnson testified:

> I think – I'm pretty certain she said to [Dean Williams], no, I won't, and she talked about that there was no scientific – in her opinion, scientific evidence to show that masks were effective. And I really just sat at the meeting and it was more the Dean and – Dean Williams and [Professor Griffin] discussing this. And if my memory serves me correctly, Dean Williams again said we have this mandate from the Chancellor's office saying that – I think it was August 18th that we all had to wear masks. You couldn't come on campus if you didn't wear a mask and [Professor Griffin] was like, no, I'm not wearing a mask.

*Id.*; ECF No. 44-27. During the August 27 meeting, Professor Griffin also refused USM's offer to switch to "part-time" status in order to teach solely online courses. DRSMF, ¶ 60.

On September 8, 2021, President Cummings sent a letter to Professor Griffin suspending her employment. JFS, ¶ 11. The letter stated the "timeline of communication related to this action is as follows":

> You made verbal statements during both the August 25th and 27th meetings indicating that you refuse to wear a face covering indoors despite the Chancellor's August 18th mandate;
> 
> In the meeting on August 25th when Dean Williams asked if you intended to resign as a result of your refusal to wear a face covering while teaching your face to face class, you replied in the negative, to the effect that the Dean would instead terminate you;
> 
> You verbally declined Dean Williams' offer on August 25th to meet again with you on this matter along with AFUM union representative and Human Resources representative;
> 
> You made verbal statements during both the August 25th and 27th meetings in which you refused to teach your assigned courses for the Fall 2021 semester; and
> 
> In an email sent via Brightspace dated Thursday, August 26th, addressed to students enrolled in the Business 360 (Marketing Strategy) course, you informed your students that you would not be teaching the course for the Fall 2021 semester and directed students to contact you at your personal email address with questions.

JFS, ¶ 11; ECF No. 44-10. The letter also stated that President Cummings was moving to terminate Professor Griffin's employment "on the grounds of refusal to complete [her] position duties and job abandonment." DRSMF, ¶ 63. The letter provided Professor

9

Griffin with information on the grievance hearing process for her termination. ECF No. 44-10. President Cummings did not attend the August 25 or 27 meetings, nor was he included in Professor's Griffin's August 24 email to Dean Williams. DRSMF, ¶ 59.

Under the AFUM grievance procedure, a faculty review committee reviews the president's request for termination at a grievance hearing. DRSMF, ¶ 69. Termination requires a vote by at least four out of the five committee members. *Id.* On the evening before her scheduled grievance hearing, Professor Griffin informed Ms. Schratz via email that she would not be present at the hearing because someone advised Professor Griffin "to not subject herself to the same hostile environment." *Id.* at ¶ 70.[6] During her deposition, Professor Griffin testified that President Cummings had created a "hostile work environment" for her by making jokes during an August 24 luncheon about individuals who did not believe in the dangers of COVID. *Id.* at ¶ 71.[7] Professor Griffin acknowledged that President Cummings did not know her views on masking at the time of the luncheon and that none of President Cummings remarks on masking were directed toward her. *Id.* at 72; Pl. Dep. Tr. at 71:9—13.

The grievance hearing took place as scheduled on September 22, 2021, and included a five-person panel of USM faculty members. JFS, ¶ 12. The panel voted unanimously to recommend Professor Griffin's immediate termination. DRSMF, ¶ 76. Two days later, on September 24, 2021, Professor Griffin received a letter from President Cummings stating that USM had terminated her employment at the panel's recommendation. *Id.* at ¶¶ 13-14.

---

[6] At her deposition, Professor Griffin stated that she could not remember who gave her the advice. ECF No. 44-2 at 115:1—17.
[7] Professor Griffin could not recall President Cummings's specific remarks. ECF No. 44-2 at 71:14—72:8.

## III. DISCUSSION

### A. Standard

Summary judgment is appropriate when viewing all factual disputes in the light most favorable to the nonmoving party, no genuine issue of material fact exists that would prevent judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a); *Montfort-Rodriguez v. Rey-Hernandez*, 504 F.3d 221, 224 (1st Cir. 2007). On a summary judgment motion, "[a] genuine dispute exists where 'a reasonable jury could resolve the dispute in favor of the nonmoving party.'" *Meuser v. Fed. Express Corp.*, 564 F.3d 507, 515 (1st Cir. 2009) (quoting *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000)). Furthermore, a "material" fact is one that has the potential to change the outcome of the suit under the governing law. *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93–94 (1st Cir. 2001). At summary judgment,

> there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose [her] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon the carapace of the cold record."

*Bonner v. Triple-S Mgmt. Corp.*, 68 F.4th 677, 689 (1st Cir. 2023) (quoting *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987)). The party opposing summary judgment "bears 'the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe.'" *Baum-Holland v. Hilton El Con Mgmt., LLC*, 964 F.3d 77, 87 (1st Cir. 2020) (quoting *Theidon v. Harvard Univ.*, 948 F.3d 477, 494 (1st Cir. 2020)).

**B. First Amendment Retaliation**

i. Whether Professor Griffin Spoke as a Private Citizen
on a Matter of Public Concern

Professor Griffin contends that UMS terminated her in retaliation for her protected speech. "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). However, because the efficient provision of public services depends in part on whether employees' words and actions are ascribed to the government, "public employees' First Amendment rights 'are not absolute.'" *MacRae v. Mattos*, 106 F.4th 122, 132 (1st Cir. 2024) (quoting *Curran v. Cousins*, 509 F.3d 36, 45 (1st Cir. 2007)). The Supreme Court has developed a multi-part test for assessing whether an adverse employment action has infringed upon a public employee's First Amendment speech rights. The test strives "both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions." *Garcetti*, 547 U.S. at 420. First, the Court must consider whether Professor Griffin spoke as a citizen on a matter of public concern. *Curran*, 509 F.3d at 45. "A dispositive factor in determining whether an employee's speech was made as a citizen 'is whether the speech underlying [the employee's] claim was made pursuant to [her] official duties.'" *O'Connell v. Marrero-Recio*, 724 F.3d 117, 123 (1st Cir. 2013) (quoting *Garcetti*, 547 U.S. at 421). If the answer to this inquiry is in the affirmative here, Professor Griffin has no First Amendment claim, because "restricting speech that owes its existence to a

12

public employee's professional responsibilities does not infringe any liberties." *Id.* (quoting *Garcetti*, 547 U.S. at 421-22).

In order to determine whether Professor Griffin's speech was made pursuant to her ordinary responsibilities as a lecturer, the Court "must take a hard look at the context of the [at-issue] speech." *Id.* at 32; *see also Lane v. Franks*, 573 U.S. 228 (2014) ("The critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."). In considering this question, the First Circuit has identified several non-exclusive and non-dispositive factors, including: "[W]hether the employee was commissioned or paid to make the speech in question; the subject matter of the speech; whether the speech was made up the chain of command; whether the employee spoke at her place of employment; . . . whether the employee's speech derived from special knowledge obtained during the course of her employment; and whether there is a so-called citizen analogue to the speech." *Decotiis v. Whittemore*, 635 F.3d 22, 32 (1st Cir. 2011) (citations omitted). Ultimately, however, "'the proper inquiry is practical rather than formal, focusing on the duties an employee actually is expected to perform,' and not merely those formally listed in the employee's job description." *Id.* at 31 (quoting *Mercado-Berrios v. Cancel-Alegria*, 611 F.3d 18 (1st Cir. 2010)).

Even though discussions about the global pandemic COVID-19 might otherwise be a matter of public concern, the practical analysis under *Decotiis* leads me to conclude Professor Griffin was not speaking as a private citizen when she sent the August 24 email. Most importantly, Professor Griffin sent her email directly to her supervisor, Dean Williams, which is "the quintessential example of speech that owes its existence to a public employee's official responsibilities and thus is not protected under the First Amendment."

13

*O'Connell*, 724 F.3d at 123 (finding the plaintiff was unable to state a plausible claim for relief because the at-issue speech "solely focused on events at her workplace and was made exclusively to fulfill her responsibilities"). The record evidence, including Professor Griffin's emails to students and another USM professor, establishes that the purpose of Professor Griffin's speech was to communicate her decision to not abide by the mandatory Masking Policy. *Cf. Ayers v. W. Line Consol. Sch. Dist.*, 691 F.2d 766, 769 (5th Cir. 1982) (finding the employer based its adverse decision on the plaintiff's criticisms of the school's policy as opposed to the plaintiff's decision to not abide by the policy). Lastly, as *Garcetti* illustrates, "there is no relevant citizen analogue to speech by citizens who are not government employees" when a public employee speaks pursuant to their job duties. *Garcetti*, 547 U.S. at 424. As opposed to disclosing information or initiating disagreement with the efficacy of COVID-19 masking to a public forum or discussing a public matter with co-workers, *see id.* (citing *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563 (1968)), the stipulated facts reveal Professor Griffin communicated to her supervisor a decision to not adhere to a mandatory workplace policy. Viewing her actions as a whole, I conclude Professor Griffin spoke pursuant to her employment duties at USM.

### ii. Whether Defendants had an Adequate Justification for its Adverse Treatment of Professor Griffin

Additionally, it bears stating that even had I found Professor Griffin spoke as a private citizen, a *Pickering* analysis, which is used to determine whether the employer has an adequate justification for its treatment of the employee, would not weigh in her favor. *See, e.g.*, *MacRae*, 106 F.4th 136. The *Pickering* analysis is a fact-intensive test that requires the Court to "balance the value of an employee's speech—both the employee's

own interests and the public's interest in the information the employee seeks to impart—against the employer's legitimate government interest in 'preventing unnecessary disruptions and inefficiencies in carrying out its public service mission.'" *Decotiis*, 635 F.3d at 35 (quoting *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 52-53 (1st Cir. 2003)). "The government employer's interest must be proportional to the value of the employee's speech; in other words, 'the stronger the First Amendment interests in the speech, the stronger the justification the employer must have'" for any adverse employment action. *MacRae*, 106 F.4th at 136 (quoting *Curran*, 509 F.3d at 48). The Court considers factors including "(1) the time, place, and manner of the employee's speech, and (2) the employer's motivation in making the adverse employment decision." *Id.* at 137 (citing *Davignon v. Hodgson*, 524 F.3d 91, 104 (1st Cir. 2008)). If these factors lead to a conclusion that the "government entity had an adequate justification for treating the employee differently" from the general public, the employee's speech is not protected, and the First Amendment retaliation claim is defeated. *Id.* at 137 (quoting *Garcetti*, 547 U.S. at 418).

While a person may have a strong interest in discussing the COVID-19 pandemic and best practices for mitigating the spread of the virus, Professor Griffin's interest in making the at-issue speech here is reduced. Even framed in a light favorable to Professor Griffin, the undisputed material evidence in the record does not posit a conclusion that a reasonable juror could find that the August 24 email reflects Professor Griffin was posing a hypothetical scenario or solely expressing a concern with the Masking Policy. As discussed in the previous section, Professor Griffin's communications evince that her August 24 email sent directly to Dean Williams reflected her decision to refuse to wear a mask in accordance with UMS's mandatory Masking Policy. Thus, Professor Griffin's

15

interest–that of an employee communicating their decision to refuse to follow a mandatory employer policy—in making the at-issue speech is substantially weakened.

On the other side of the analysis, Defendants have a significant interest in protecting their employees and students from the spread of COVID-19 in hopes of returning to normal in-person instruction in the wake of the COVID-19 pandemic. *See, e.g.*, *Does 1-6 v. Mills*, 16 F.4th 20 (1st Cir. 2021) ("Stemming the spread of Covid-19 is unquestionably a compelling interest." (citing *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 67 (2020))); *Bayley's Campground, Inc. v. Mills*, 985 F.3d 153 (1st Cir. 2021) (finding an interest in preventing Maine's healthcare system from being overwhelmed by people infected with COVID to be compelling under strict scrutiny).

Defendants also have an interest in assuring its employees abide by university policies, and preventing any disruption that an employee's noncompliance may cause. *Diaz-Bigio v. Santini*, 652 F.3d 45, 54 (1st Cir. 2011) ("The legitimate interest of public employers in maintaining discipline is well established."). Professor Griffin sent the email just six days before the fall semester began. Contrary to Professor Griffin's assertion that Defendants terminated her based on a "hypothetical decision," USM was not required to wait until Professor Griffin appeared on campus without a mask to initiate disciplinary actions. *See Curran v. Cousins*, 482 F. Supp. 2d 36 (D. Mass. 2007) ("The employer need not tolerate speech that evinces or encourages 'intransigence and insubordination.'" (quoting *Hennessy v. City of Melrose*, 194 F.3d 237, 248 (1st Cir. 1999)), *aff'd*, 509 F.3d 36 (1st Cir. 2007). The law affords great weight to an employer's prediction of a disruptive effect. *See, e.g.*, *Waters v. Churchill*, 511 U.S. 661, 673 (1994) (The Supreme Court "give[s] substantial weight to government employers' reasonable predictions of disruption, even

16

when the speech involved is on a matter of public concern."). Thus, Defendants' interest in its adverse treatment of Professor Griffin is robust.

I also note that Professor Griffin's suspension occurred two weeks after the August 24 email to Dean Williams, and Professor Griffin's termination occurred two weeks after the suspension—which was also after Professor Griffin declined the opportunity to participate in her grievance hearing. Within that period, not once does the record indicate Professor Griffin communicated her intent to comply with the Masking Policy. Thus, Defendants' prediction that Professor Griffin's conduct would cause disruption is reinforced. *Curran*, 509 F.3d at 49. Professor Griffin herself admitted that Dean Williams reasonably could view her email as an outright refusal to abide by the Masking Policy. *See MacRae*, 106 F.4th at 137 (explaining the plaintiff's own statements admitting that her employer could view the at-issue speech as derogatory weakened the plaintiff's interests in making the speech). Even when given an offer to switch to part-time employment to administer her courses completely online, and given the opportunity to be heard on whether she should be terminated, Professor Griffin did not express an intent to comply with the Masking Policy to teach in person.

I find Defendants' interests in safety and preventing disruption greatly outweigh Professor Griffin's interest in communicating the at-issue speech. As stated in the previous section, Professor Griffin's speech is not protected by the First Amendment. Summary judgment is granted for Count I.

### C. Sex Discrimination

In her opposition brief, Professor Griffin explained that she focused only on her First Amendment claim and waived her written arguments as to Counts III and IV in the Amended Complaint. *See* ECF No. 52 at 1 n.1. As a result, Defendants argue Professor

17

Griffin's claims under Counts III and IV are waived completely. First Circuit precedent is clear that "an issue raised in the complaint but ignored at summary judgment may be deemed waived." *Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995); *Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46 (1st Cir. 2014) ("After filing their complaint, the plaintiffs did nothing to develop this particular claim, and the summary judgment papers disclose no development of it. The claim is, therefore, waived."). Therefore, Professor Griffin has waived her sex discrimination claims entirely. Summary judgment is granted for Counts III and IV.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED** in its entirety.

**SO ORDERED.**

Dated this 30th day of April, 2025

/s/ Stacey D Neumann
U.S. DISTRICT JUDGE